IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

WILLIAM G. TACK AND JOAN B. TACK                                    PLAINTIFF
FAMILY TRUST

VS.                                    NO. 4:09CV00515 BSM

CITY OF SHERWOOD, ARKANSAS                                    DEFENDANT

<u>BRIEF IN SUPPORT OF</u>
<u>MOTION FOR SUMMARY JUDGMENT</u>

<u>INTRODUCTION</u>

The Plaintiffs, the William G. Tack and Joan B. Tack Family Trust (the "Tacks"),

have sued the City of Sherwood (the "City") alleging a number of state and federal

claims.  The Tacks live next to a sewer treatment facility owned and operated by the City.

The Tack family wants the City to buy their property (the "Property"), and their

Complaint appears to be motivated by a failed real estate transaction between the two

parties.  The Sherwood City Council ("City Council") did not approve funds for the

City's purchase of the Property, and the Tacks now contend that the sewer treatment

facility is a nuisance and its presence adjacent to the Property constitutes an unlawful

taking of the Property without just compensation.

The City removed to federal court, pursuant to 28 U.S.C. § 1441 and § 1446.  The

Plaintiffs' Complaint alleges causes of action for substantive due process (*see* Complaint,

¶ 3), taking without just compensation (*see* Complaint, ¶ 3), and trespass (*see* Complaint,

¶ 8).  The City disputes the Plaintiffs' allegations.  However, the City accepts those

allegations as true solely for the purpose of this motion for summary judgment.

The City submitted this motion for summary judgment based on the following arguments. First, the Tacks cannot prove reliance on any alleged statements made by City officials, and governmental entity estoppel therefore does not apply. Second, the Tacks' allegations do not rise to the level necessary to prove a taking on either the state or federal level. Third, the Tacks' claim that the sewer treatment facility is a nuisance is offset by the fact that the facility was present when the Tacks purchased the Property. Fourth, the Tacks' claims regarding the driveway and utilities are more accurately characterized as trespasses rather than evidence of a taking, and the appropriate remedy for a trespass is damages, not forcing the City to purchase the Property in its entirety. Fifth, the City should not be held responsible for an alleged trespass by floodwaters, as a property owner is not liable to an adjacent owner for surface water present on both properties, and the Tacks have not shown how the Property was damaged. Sixth, the appropriate action for the Tacks' odor complaint is a nuisance claim, not a federal takings claim. Finally, the Property has not been devalued because the Tacks have failed to present proof of actual monetary damage to the Property. Even assuming all of the Plaintiffs' allegations to be true, the Plaintiffs have failed to establish that any of their allegations rise to the level of constitutional violations, and the Defendant is entitled to judgment as a matter of law.

The Court must now decide the following issues: (1) whether the City's operation of the sewer plant located at 19 Algonkin Road in Sherwood, Arkansas, adjacent to the Property, has resulted in an unconstitutional taking of the Property; (2) whether the City and its representatives have trespassed on the Property or were given permission to use the Property for access to City property in certain instances; (3) whether the Plaintiffs moved to the alleged nuisance, thereby defeating their own claim; (4) whether the City

has caused the Property to be devalued; and (5) the effect of government entity estoppel, if any.

STATEMENT OF FACTS

The Property and the Sewer Plant

William and Joan Tack (the "Tacks" or individually, "Mr. Tack" or "Mrs. Tack") bought the Property from the Dupree Brothers around 1992 or 1993. (*See* Exhibit "1", Deposition of Joan Tack, page 6). The Property is adjacent to property owned by the City of Sherwood, Arkansas. The Tacks moved a house onto the Property around 1994. (Deposition of Joan Tack, pages 6-7). The Tacks eventually acquired approximately twenty-one acres and lived on the Property continuously until William Tack's death in May 2006. (Deposition of Joan Tack, pages 6, 8-9). After William Tack's death, Joan Tack continued to live on the Property for almost one year; she no longer spends the night there because since her husband passed away she has not been able to sleep if she is at home. (Deposition of Joan Tack, pages 5, 9). (Deposition of Joan Tack, page 9). The Tacks deeded the Property to the William and Joan Tack Trust prior to Mr. Tack's death. (Deposition of Joan Tack, page 12).

When the Tacks bought the Property, the sewage treatment facility consisted of two big settling ponds, which were hidden by trees, bushes, and shrubbery. (Deposition of Joan Tack, pages 32, 33; *see* Exhibit "2", Deposition of Barry Tack, pages 12-13; *see* Exhibit "3", Deposition of Bill Miller, page 57). The sewage treatment facility included the settling ponds and a small concrete building with a pump inside it. (Deposition of Joan Tack, page 32). All of the raw sewage that treatment facility handled passed through the pumping station and then into the ponds. (Deposition of Bill Miller, page

3

25).  There was no odor coming from the ponds when the Tacks bought the Property, and neither the ponds nor the pumping station were visible from their house.  (Deposition of Joan Tack, page 33, Deposition of Barry Tack, pages 12-13).

Mr. Tack had a stroke in 1997 but remained mentally competent, although his speech was not completely clear.  (Deposition of Joan Tack, pages 30, 59).  In the spring of 1997, after Mr. Tack's stroke, Michael Clayton and Bill Miller, employees of the City of Sherwood, asked the Tacks if the City could purchase some of the Tacks' land in order to build a multi-million dollar sewage treatment plant, or "package plant".  (Deposition of Joan Tack, pages 32, 35, 59).  Mr. Clayton said it would have absolutely no odor and when the water had gone all the way through the plant, it would be drinking water.  (Deposition of Joan Tack, page 35).  The Tacks were not interested initially, and Mr. Clayton and Mr. Miller told them there was another Sherwood treatment plant the Tacks could look at, off Kiehl Avenue and Lee Street.  (Deposition of Joan Tack, pages 35, 36).  The plant the Tacks visited was completely underground. (Deposition of Joan Tack, page 35).  The Tacks thought the treatment plant did not look bad, and Mr. Tack told his wife that if the City needed the land and the Tacks refused to sell it, the City could take it by eminent domain.  (Deposition of Joan Tack, page 36).

The Tacks agreed to sell the City one acre, and the City deeded another piece of land that was approximately the same size to the Tacks; no money changed hands. (Deposition of Joan Tack, pages 37-38).  After the City purchased the acre and was beginning to build the first plant, Mr. Tack asked them if they would like to use dirt on the Tacks' Property to build the levee, and the builders dug the Tacks' pond out and used the dirt for the sewer treatment plant.  (Deposition of Joan Tack, page 34).  The City paid

4

the Tacks about six thousand dollars ($6,000.00) for the dirt.  (Deposition of Joan Tack, page 34).

The City began building the first plant sometime in 1997.  (Deposition of Joan Tack, page 40).  The Tacks were living in their house and observed the construction. (Deposition of Joan Tack, page 40).  Mrs. Tack stated that it was hard to know what was happening while they were building because there was so much dirt.  (Deposition of Joan Tack, page 40).  Barry Tack does not believe his parents had full comprehension of what the City was doing when it built the plants.  (Deposition of Barry Tack, pages 17-18). Mrs. Tack asked the builders to put the plant as far away from the house as they could. (Deposition of Joan Tack, page 40).  The Tacks only sold the City one acre for the plant, and they understood the plant would be built on that acre.  (Deposition of Barry Tack, page 19).  During the construction process, the Tacks did not know the finished facility would be visible.  (Deposition of Joan Tack, page 41).  The dirt does not hide the entire facility the way it does at the plant the Tacks visited prior to agreeing to sell the land to the City.  (Deposition of Joan Tack, page 41).  Mrs. Tack does not remember if either she or Mr. Tack said anything to anyone who worked for the City regarding the differences between what they were told would be built and what was actually built.  (Deposition of Joan Tack, page 41).  Mrs. Tack thinks her husband may have said something, but he also said there was nothing they could do about it.  (Deposition of Joan Tack, page 41).

The Tacks did not know how big the plant would be and were never shown drawings of the plant.  (Deposition of Barry Tack, page 19).  The City never promised the Tacks in writing how big or small the plant would be, or where it would be placed on the

5

Property, and no such language is in the deed to this effect.  (Deposition of Barry Tack, page 20).

After the one acre transaction, Mayor Harmon asked the Tacks if the City could purchase the four acres adjacent to the acre the City had already purchased.  (Deposition of Joan Tack, page 39).  Mayor Harmon told the Tacks he was not going to develop the four acres, but he had another piece of "green land" that he was going to have to build on, and he needed to replace the green space.  (Deposition of Joan Tack, page 39).  The Tacks agreed to sell the four acres to the City for $35,000.  (Deposition of Joan Tack, page 39).

The Tacks knew the City wanted to build a treatment plant when they sold the four acres.  (Deposition of Joan Tack, page 42).  Mrs. Tack was unhappy with the way the first facility was built; the plant was much closer to the house than the Tacks thought it would be, was much bigger, and was more visible.  (Deposition of Joan Tack, page 64).  Mrs. Tack says they were led to believe there would be a big hill with not so visible and smaller facilities, located farther from the Tacks' house.  (Deposition of Joan Tack, page 64).  The Tacks only sold the second piece of property because Mayor Harmon said it would remain green, and they believed him.  (Deposition of Joan Tack, page 64).

Around 2002, about a year after the sale of the four acres, the City began building the second plant.  (Deposition of Joan Tack, page 42).  Mr. Tack was upset when the City started building the second plant, because Mayor Harmon said they were not going to build on the four acres.  (Deposition of Joan Tack, page 59-60).  Mr. Tack protested to Mrs. Tack, but she does not think he talked to Mayor Harmon about it.  (Deposition of Joan Tack, page 60).  Mrs. Tack did not talk to Mayor Harmon about it.  (Deposition of

6

Joan Tack, page 60).  Mr. Tack said it was the City's land and they could do anything they wanted with it.  (Deposition of Joan Tack, page 60).  Mayor Harmon has since passed away.  (Deposition of Joan Tack, page 62).

No language was ever put in a deed between the Tacks and the City restricting the use of the land.  (Deposition of Joan Tack, page 62).  The Tacks never had any written agreements with the City about visibility or smell; Michael Clayton promised when he came to ask the Tacks about buying the land that there would be no odors, that it would be very up-to-date, and that the water would be drinking water when it came through. (Deposition of Joan Tack, pages 63-64).  Mrs. Tack understood the purpose of the plant was to take raw sewage and process it through the plant, and she understands that raw sewage has an odor.  (Deposition of Joan Tack, page 63).

## The Sewer Treatment Facility

There are two sewage treatment plants across from the Tacks' pond.  (Deposition of Joan Tack, page 35).  Bill Miller was the wastewater manager beginning in 1995, until he was replaced by Michael Clayton, and he became the wastewater manager again in 2008, upon Mr. Clayton's departure.  (Deposition of Bill Miller, pages 8-9).

The City's property was originally a treatment facility in a lagoon system. (Deposition of Bill Miller, page 11).  There are now three facilities that were formerly three ponds.  (Deposition of Bill Miller, page 12).  The original wastewater treatment plant consisted of a series of settling ponds; the raw sewage progressed from one cell to a polishing cell, and then it discharged on the opposite side.  (Deposition of Bill Miller, page 56).  In the first pond, the waste settled, and then the liquid flowed into the second pond before being discharged into the creek.  (Deposition of Bill Miller, page 57).  The theory

7

was that by the time the liquid was discharged it was clean water.  (Deposition of Bill Miller, page 57).  These settling ponds were built within the ADEQ standards in force at the time.  (Deposition of Bill Miller, pages 57-58).

The buildings now present at the facility are package plants, or sequencing batch reactor ("SBR") plants.  (Deposition of Bill Miller, pages 58, 59).  The first "package plant" was built in the mid-1990s, on land acquired from the Tacks.  (Deposition of Bill Miller, pages 57, 64-65).  The dirt the Tacks sold to the City was used to build the first plant.  (Deposition of Bill Miller, page 65).

The wastewater enters the pump station and then goes through a screening device that takes all of the heavy solids out and puts them into a dumpster; then it goes through a grit chamber, which removes the dirt and grit.  (Deposition of Bill Miller, page 17).  The dirt and grit also go into a dumpster.  (Deposition of Bill Miller, page 17).  The wastewater then enters the facility for processing.  (Deposition of Bill Miller, page 17).

The wastewater department currently uses two SBR plants to treat wastewater, and the wastewater enters the facility through SBR treatment plant number two.  (Deposition of Bill Miller, pages 14-16).  Treatment of raw sewage in an SBR occurs completely within the SBR.  (Deposition of Bill Miller, page 59).  The two basins in use are the same but are sequenced; when one basin is filling up, the other is processing and discharging the effluent.  (Deposition of Bill Miller, pages 60-61).  After treatment, the facility discharges the remains of the wastewater, which goes through a post-aeration process where oxygen is added to the water and then through a series of UV lights to kill the germs.  (Deposition of Bill Miller, pages 19-20).  The water is discharged down the levee and into Bayou Meto.  (Deposition of Bill Miller, page 20).

8

The ponds are now used in conjunction with the SBR system.  (Deposition of Bill Miller, page 61).  The far northern pond is an equalization basin and was previously a treatment lagoon.  (Deposition of Bill Miller, pages 11-13).  When the SBR plants reach their maximum, the sewage is diverted into the equalization basin.  (Deposition of Bill Miller, page 64).

The SBR plants do not flood or overflow, regardless of the amount of rain. (Deposition of Bill Miller, page 64).  The equalization basin is used as a holding pond until the wastewater can be treated.  (Deposition of Bill Miller, pages 62-63).   The equalization basin can be used to split high water flows, but everything from the force main goes through the SBRs.  (Deposition of Bill Miller, page 62).  The equalization basin is only used when there is a significant rain event.  (Deposition of Bill Miller, page 63).

Rain causes the collection system to fill up faster, but because the plant is controlled by computers, there are things that can be done to make treatment faster without violating the permit.  (Deposition of Bill Miller, page 63).  In an older sewer system, rainwater will infiltrate the sewer pipes, causing more liquid to be delivered than during a dry period, and in that case the equalization basin would be used.  (Deposition of Bill Miller, pages 63-64).

The sludge pond is right below the equalization basin.  (Deposition of Bill Miller, pages 12-13).  Sludge is the waste product of wastewater but is no longer raw sewage or a biohazard.  (Deposition of Bill Miller, pages 13, 61-62).  When the sludge gets to a certain level in the basins, it dies, because it is a living organism.  (Deposition of Bill Miller, page 20).  As it dies, the wastewater management crew wastes it into the sludge pond. (Deposition of Bill Miller, page 20).  The sludge from the SBRs is held in the sludge pond

after it has been completely processed.  (Deposition of Bill Miller, pages 13, 61-62).  After the sludge is removed from the sludge pond, it can be used as fertilizer.  (Deposition of Bill Miller, page 62).  When the sludge pond gets high, there is a valve that takes the water off the top, which is then sent back through the facility for treatment.  (Deposition of Bill Miller, page 20).  From time to time the waste management crew has to clean the sludge pond.  (Deposition of Bill Miller, page 21).

The City has three basin systems (which are not the aforementioned ponds) and is only operating off of two.  (Deposition of Bill Miller, page 36).  The third basin is being prepared for operation and is permitted by the ADEQ but is not currently necessary.  (Deposition of Bill Miller, pages 36-37).

The Sherwood sewer system is mostly a gravity feed system; there are some pump stations, and if a gravity feed will not work, a lift station is built to bring the wastewater back down to the gravity system.  (Deposition of Bill Miller, page 71).  Both systems are present at the north plant; it has a force main system and a gravity system.  (Deposition of Bill Miller, page 71).

The north plant has the capacity to serve more customers than it presently serves.  (Deposition of Bill Miller, page 60).  The department would not need to build anything else to serve more customers; it would only need to put the third basin into operation.  (Deposition of Bill Miller, page 60).

## Discussions with the City

Mr. Tack talked to Mayor Harmon and other City officials over the years about eventually selling the Property to the City, because Mayor Harmon said if the Tacks ever moved the City would want to buy the Property. (Deposition of Joan Tack, page 30).

About one year after William Tack's death, Joan Tack asked her son, Barry Tack ("Barry"), to go see Mayor Harmon about purchasing the Property, and Mayor Harmon told Barry Tack to get the Property appraised and bring the appraisal to him, which Barry did.  (Deposition of Joan Tack, page 9).   The appraisal report is dated September 14, 2006.  (Deposition of Joan Tack, page 9).  Joan Tack also met with Mayor Harmon many times to discuss selling the Property, and Mayor Harmon expressed interest in buying it on those occasions.  (Deposition of Joan Tack, page 10).  Joan Tack did not have any discussion with Mayor Harmon regarding selling the Property to the City after he received the appraisal.  (Deposition of Joan Tack, page 10).

After Mayor Harmon received the appraisal and did not take action to buy it, Mrs. Tack listed the Property for sale with her son, Barry, who was a licensed realtor with Branscum and Company.  (Deposition of Joan Tack, page 14, Deposition of Barry Tack, pages 5-6).  A realtor who showed the Property told Joan Tack that the Property had "bad odors," and the Tacks dropped the price several times.  (Deposition of Joan Tack, page 14).

At some point in the summer of 2008, Bill Miller called Barry Tack and told him Mayor Hillman was interested in purchasing the Property.  (Deposition of Joan Tack, page 14).  Shortly after that, an offer was made on the Property by Anthony Neff ("Mr. Neff") on July 31, 2008, for $169,000.  (Deposition of Barry Tack, page 7, Deposition of Joan Tack, pages 15, 19).  Mr. Neff's offer was written by Excel Realty Group and presented to Joan Tack on August 2, 2008, by Barry Tack and Branscum and Company. (Deposition of Barry Tack, pages 5, 10, Deposition of Joan Tack, page 15).  Mr. Neff's offer on the Property was the only offer the Tacks received while the Property was on the

11

market, and Mrs. Tack was prepared to accept it, but she did not think it was enough. (Deposition of Joan Tack, page 19).

Mrs. Tack thought it would be smarter to sell the Property to the City than to Anthony Neff, and she hoped the City would pay a higher price than Mr. Neff had offered.  (Deposition of Joan Tack, pages 30-31).  After receiving the offer, Joan Tack spoke with Mayor Hillman between 2:30pm and 5:00pm on August 2.  (Deposition of Barry Tack, page 10).  Mrs. Tack told Mayor Hillman about Mr. Neff's offer and Bill Miller's call to Barry Tack expressing interest in the Property.  (Deposition of Joan Tack, page 15).  Mayor Hillman said she was definitely interested in the Property and the City needed it to ensure the sewer plant was in compliance with certain rules and regulations. (Deposition of Joan Tack, page 15).  With regard to the compliance issue, Mayor Hillman said the City needed to own the entire road going into the plant, and the City would like to use the house as a laboratory and office.  (Deposition of Joan Tack, pages 70-71).

Mrs. Tack asked Mayor Hillman if she was certain the City wanted to purchase the Property, and Mayor Hillman said yes.  (Deposition of Joan Tack, pages 15-16). Mayor Hillman said she did not want anyone to miss a sale, but she would find out if the City was still interested.  (*See* Exhibit "4", Deposition of Virginia Hillman, page 20). Mayor Hillman never got the assurance that there was a solid offer, only interest in the Property; she never saw the offer from Anthony Neff.  (Deposition of Virginia Hillman, page 21).  During the telephone conversation, Mayor Hillman and Mrs. Tack agreed to meet the following week.  (Deposition of Virginia Hillman, page 21).

Barry Tack asked his mother to make sure that she clarified to Mayor Hillman that she was rejecting the offer she had, and to make sure the City would really buy the

Property.  (Deposition of Barry Tack, page 9).  Joan Tack called Mayor Hillman again before rejecting Anthony Neff's offer.  (Deposition of Joan Tack, page 16, Deposition of Barry Tack, page 9).  Barry Tack also called Mayor Hillman, and she told him the City really wanted and needed to buy the Property.  (Deposition of Barry Tack, pages 9, 10-11).  Barry Tack asked Mayor Hillman if she understood the Tacks were going to reject Mr. Neff's offer without counter-offering, and she said yes.  (Deposition of Barry Tack, page 9).  Barry Tack believed at the time that Mayor Hillman was making a binding promise to purchase the Property.  (Deposition of Barry Tack, page 10).  Mayor Hillman and Barry Tack did not discuss a price for the Property during this telephone call. (Deposition of Barry Tack, page 11).

Mrs. Tack rejected Mr. Neff's offer at 5 p.m. on August 2, 2008.  (Deposition of Joan Tack, pages 20-21).  On Monday, August 4, 2008, Mrs. Tack called the mayor's office and made an appointment to see Mayor Hillman on Tuesday, August 5. (Deposition of Joan Tack, page 26).

On August 5, 2008, Joan and Barry Tack met with Mayor Hillman, City Attorney Steve Cobb, City Engineer Ellen Norvell, and Alderman Charles Harmon. (Deposition of Joan Tack, page 27, Deposition of Barry Tack, page 11, Deposition of Virginia Hillman, page 21).  Mayor Hillman did not tell Mrs. Tack she could not bring a lawyer, but she does not remember if she told Mrs. Tack the City Attorney would be there.  (Deposition of Virginia Hillman, pages 21-22).  Mayor Hillman cannot contract on behalf of the City, and she felt that she needed the City Attorney there before she engaged in legal conversation.  (Deposition of Virginia Hillman, page 22).

13

During the meeting, the City officials and the Tacks discussed the proper procedure for the City if it decided to move forward with the purchase. (Deposition of Virginia Hillman, pages 23-24). Mayor Hillman believes a reasonable protocol would have been for the Tacks to make an offer to the City to sell the Property to the City, because some documentation would have to be presented to the City Council in order to show that there was a valid potential sale. (Deposition of Virginia Hillman, pages 24-25).

The City Attorney, Steve Cobb, explained to the Tacks that the City Council would have to authorize the purchase; Mayor Hillman believes this information was conveyed to the Tacks during the meeting. (Deposition of Virginia Hillman, page 24). Mayor Hillman understood that the City could only buy the Property with the approval of the City Council, because that is the law. (Deposition of Virginia Hillman, page 25). Whether Mayor Hillman wanted to buy the Property or not is irrelevant, because the City Council has to appropriate the funds; Mayor Hillman's job is to spend the money after it has been appropriated. (Deposition of Virginia Hillman, page 25).

The City officials said they definitely wanted the Property and needed it to ensure the City was in compliance. (Deposition of Joan Tack, page 27). Barry Tack told the City officials to make them an offer. (Deposition of Joan Tack, page 27). During the meeting, Mayor Hillman said she thought the Property was probably worth $200,000. (Deposition of Joan Tack, page 27). At that time the Property was listed for $249,000. (Deposition of Joan Tack, page 27). During the meeting, the City officials said no one would want to buy the Property because of the presence of the sewage treatment facility. (Deposition of Barry Tack, pages 11-12).

14

The City cannot spend money that is unbudgeted without City Council approval. (Deposition of Virginia Hillman, page 24). Before the City purchases property, the City Council must approve the purchase and appropriate the funds. (Deposition of Virginia Hillman, page 24). According to Mrs. Tack, no one said anything during the meeting about needing the City Council to approve or appropriate the money, but Mrs. Tack understood that after she received the offer with the contingency written on it. (Deposition of Joan Tack, pages 29-30).

After the meeting, the Tacks kept the Property on the market. (Deposition of Barry Tack, page 14). The Property was shown several times, but there were several complaints about the odor. (Deposition of Joan Tack, page 14, Deposition of Barry Tack, pages 14-15).

Between August 5, 2008 and November 7, 2008, Steve Cobb made several phone calls to Barry Tack, and they tried to negotiate a price on the Property. (Deposition of Barry Tack, pages 14, 20). During their conversations, Barry Tack told Steve Cobb he wanted something in the range of $300,000 to $350,000. (Deposition of Barry Tack, page 14). Between August 5, 2008 and November 7, 2008, Mrs. Tack had no discussions with Mayor Hillman or any other City official, and she did nothing to try to get the City to carry out its intention to buy the Property; she waited for a City official to contact her. (Deposition of Joan Tack, pages 27-28, 30).

On November 7, 2008, Mrs. Tack received a letter from Steve Cobb, the City Attorney, in which the City offered $229,000 to purchase the Property. (Deposition of Joan Tack, pages 13-14). Mayor Hillman believes the Tacks offered the Property to the

City at a price lower than the appraised value because they had already lowered it on the real estate market.  (Deposition of Virginia Hillman, page 27).

Barry Tack prepared the real estate contract (attached as Exhibit 2 to the Deposition of Joan Tack, hereafter referred to as the "Contract") between the City and Joan Tack.  (Deposition of Joan Tack, page 17, Deposition of Barry Tack, page 22). Barry Tack and Steve Cobb negotiated the $229,000 purchase price, but Barry told Mrs. Tack he thought she was "basically being screwed."  (Deposition of Barry Tack, page 21).

Steve Cobb said the contingency on City Council approval had to be written in the Contract, and Barry Tack wrote it in.  (Deposition of Barry Tack, pages 21, 22).  Steve Cobb said that City Council approval was merely a formality, but it should be no problem at all.  (Deposition of Barry Tack, page 21).  Page five of the Contract indicates that the Contract is contingent upon the City Council's approval.  (Deposition of Joan Tack, pages 17-18).  Both Mrs. Tack and Barry Tack understood the contingency. (Deposition of Joan Tack, page 18, Deposition of Barry Tack, page 22).

No one gave Joan Tack any assurance that the City Council would accept the offer.  (Deposition of Joan Tack, page 18).  Mrs. Tack did not personally speak with any members of the City Council regarding the offer and potential sale before the City Council meeting at which the issue was discussed.  (Deposition of Joan Tack, pages 13-14).  Neither Joan Tack nor Barry Tack attended the City Council meeting on November 24, 2008.  (Deposition of Joan Tack, page 18, Deposition of Barry Tack, page 22).

During the November 24, 2008 City Council meeting, the council discussed the Property, the sewer committee's potential use of the Property, the amount the Property appraised for, and whether the sewer committee needed the land or if it was just a nicety.

(*See* Exhibit "5", Deposition of Kevin Lilly, pages 9, 11).  Alderman Sheila Sulcer stated the "[P]roperty . . . [is] not worth anything except to the City of Sherwood."  (*See* Exhibit "6", Deposition of Sheila Sulcer, pages 11-12; *see* Exhibit "8", Sherwood City Council Meeting minutes, November 24, 2008, page 6).  Alderman Sulcer opposed appropriating $229,000 to purchase the Property because she did not believe the City needed to purchase additional property.  (Deposition of Sheila Sulcer, pages 19-20).  The sewer committee recommended that $150,000 would be a more reasonable price than $229,000.  (Deposition of Kevin Lilly, page 10).  The sewer committee arrived at the value of $150,000 after a committee meeting; Bill Miller suggested that $150,000 would be a reasonable price and the Property would be a good value to the sewer department if it could be purchased at that price.  (Deposition of Kevin Lilly, pages 10-11).  The sewer committee felt like Mr. Miller's recommendation was reasonable and made its recommendation based on Mr. Miller's.  (Deposition of Kevin Lilly, page 12).  Mayor Hillman was in favor of approving the appropriation of funds to purchase the Property for $229,000 at the November 24 City Council meeting but now feels that the City is being forced to buy the Property.  (Deposition of Virginia Hillman, pages 9-10).

The City Council did not accept the $229,000 offer to purchase the Property.  (Deposition of Bill Miller, page 38).  Steve Cobb called Barry after the meeting and told him the offer had been rejected, but they would be in touch soon because they still wanted to buy the Property.  (Deposition of Barry Tack, page 22).  Mayor Hillman does not believe purchasing the Property was ever discussed at another City Council meeting. (Deposition of Virginia Hillman, page 26).

The Property is not currently listed for sale. (Deposition of Joan Tack, page 69). The Property was last on the market around December 2008, listed at approximately $249,900. (Deposition of Barry Tack, page 30). Mrs. Tack has not relisted the Property for sale because she has been out of town and not able to keep it clean enough to show to prospective buyers. (Deposition of Joan Tack, page 70). Mrs. Tack has not talked to anyone about buying the Property since the City Council declined to accept the Tacks' offer. (Deposition of Joan Tack, page 69).

Barry Tack has spoken with Steve Cobb and Ellen Norvell since the City Council meeting. (Deposition of Barry Tack, page 24). Ms. Norvell came to the house to see if it could be converted into an office and laboratory, and Barry Tack let her in. (Deposition of Barry Tack, pages 24-25). After Ms. Norvell arrived, the door opened and Charlie Cadie, the plant manager, came flying through the door with Bill Miller behind him. (Deposition of Barry Tack, page 25). Ms. Norvell told them they should not come in the house without knocking, and Charlie said, "Oh, we know the Tacks, ha, ha, ha, we know the Tacks, we can come in here any time." (Deposition of Barry Tack, page 25). During that meeting, Bill Miller said they really wanted and needed the Property, and the Property was worth the full price. (Deposition of Barry Tack, page 25). Mr. Miller did not state a specific figure, and Barry did not discuss anything with him at that time. (Deposition of Barry Tack, page 25).

Barry Tack talked to Steve Cobb after the Tacks' neighbors called Barry to tell him City employees were on the Property, driving around the house and through the yard, standing on the front porch, and driving through the yard. (Deposition of Barry Tack, page 26). Barry called Steve Cobb and told him City employees were at the house, and he

18

was sure they were City employees because the vehicles had "City of Sherwood" written on them. (Deposition of Barry Tack, page 26). Barry told Mr. Cobb to tell the City employees to get off the Tacks' Property. (Deposition of Barry Tack, page 27). Mr. Cobb said the City employees had no business being on the Property, and he would call them immediately to make sure they left. (Deposition of Barry Tack, page 27). According to the neighbors, the City employees did leave, but they have been back again several times since that incident. (Deposition of Barry Tack, pages 27-28). According to Barry Tack, telling the City employees to stay off the Property has not made a difference. (Deposition of Barry Tack, page 28).

## The Road, the Tacks' Driveway, and Flooding

A deed dated February 15, 2001, allowed the City an easement for egress and ingress to the sewer ponds. (Deposition of Joan Tack, page 44). The City owns half of the road and the Tacks own the other half. (Deposition of Joan Tack, page 47). The Tacks do not dispute that the City has a right to use the road. (Deposition of Joan Tack, page 48). When the City bought the four acres, the City paid $25,000 for the land and also paved the road, which was worth $10,000. (Deposition of Joan Tack, page 45).

During heavy rains, the road floods. (Deposition of Bill Miller, page 41). The City uses the Tacks' driveway when rain causes the paved road to become flooded. (Deposition of Joan Tack, page 48, Deposition of Bill Miller, page 41). Bill Miller used to ask the Tacks before he used their driveway for access to the plant or to park trucks, and the Tacks always agreed. (Deposition of Joan Tack, page 48).

Years ago, when flooding became a problem, Mr. Tack told Mr. Miller he could use the driveway any time he needed to, but this promise was not in writing. (Deposition

19

of Bill Miller, page 41, Deposition of Virginia Hillman, page 17).  Mr. Tack has since passed away.  (Deposition of Bill Miller, pages 41-42).  The City still uses the driveway occasionally, including as recently as the spring of 2009.  (Deposition of Bill Miller, page 42, Deposition of Virginia Hillman, page 17).  No one told Mr. Miller he could no longer use the driveway.  (Deposition of Bill Miller, page 42).

Mr. Miller has also accessed the plant by boat when the road was flooded. (Deposition of Bill Miller, page 42).  Mrs. Tack would like the City to stop using the driveway without permission.  (Deposition of Joan Tack, page 48).  The City has used the driveway at other times, when the road is not flooded, as well.  (Deposition of Joan Tack, page 49).

Mrs. Tack has seen potholes in her driveway and, later, she saw where they had been patched.  (Deposition of Joan Tack, page 72).  Mrs. Tack believes heavy trucks owned by the City caused the potholes.  (Deposition of Joan Tack, page 72).  There was a pothole in the driveway that the City did not cause, but the City repaired the pothole as an act of good faith.  (Deposition of Virginia Hillman, page 17).

On another occasion, Barry Tack went out to see the floodwater and parked his truck on the Tacks' driveway in front of the house.  (Deposition of Barry Tack, page 33). Bill Miller drove up, told Barry to tell Mrs. Tack hello, and drove through the yard to get around Barry's truck, which caused a rut in the yard.  (Deposition of Barry Tack, pages 33-34).  Another City truck came shortly after that and also drove through the driveway. (Deposition of Barry Tack, page 34).  The Tacks have not put up a fence or gate across their driveway.  (Deposition of Barry Tack, page 34).

<u>**The Tack Pond and the Sludge Pond**</u>

Parts of the Tack Property and the City's property are flood-prone, specifically areas marked "5" and "8" on Exhibit 4 to the Deposition of Kevin Lilly, hereafter described as "Map 1". (Deposition of Joan Tack, page 68). The property behind the Tacks' house is a low-lying area, and it floods after a heavy rain. (Deposition of Joan Tack, page 55). The source of the floodwater on the Tacks' Property is Bayou Meto, heavy rains, and water coming in. (Deposition of Barry Tack, page 32). The one acre [marked number 5 on Map 1] may flood more than the low area behind the Tacks' house. (Deposition of Joan Tack, page 55).

Mrs. Tack does not believe Bayou Meto is on any part of her Property, or that Bayou Meto borders her Property. (Deposition of Joan Tack, page 56). The other sixteen acres the Tacks own are on higher ground. (Deposition of Joan Tack, page 56).

The flood water has never gotten up around the Tacks' house. (Deposition of Joan Tack, page 68). The property the house sits on is higher than the one acre. (Deposition of Joan Tack, page 50). The low-lying acre has always filled in with water when it rains. (Deposition of Joan Tack, page 50). After a heavy rain, the water on the five acres will rise a little bit from behind the Property due to the Bayou Meto. (Deposition of Barry Tack, page 32).

Bayou Meto floods from time to time. (Deposition of Bill Miller, page 66). When Bayou Meto floods, the water backs up into the woods behind the SBR plants. (Deposition of Bill Miller, page 66). The water from Bayou Meto backs up, comes around the plant, and is drained through a pipe under the road into the Tacks' pond. (Deposition of Bill Miller, page 21, Deposition of Barry Tack, pages 31, 32). Water also flows into the Tacks' pond from the swampy area to the east of the Property, as well as

21

from land south of the Property.  (*See* Exhibit "7", Deposition of Charles Cadie, pages 14-15, 22-23).  Two pipes, marked number "12" on Exhibit 2 to the Deposition of Charles Cadie (hereafter referred to as "Map 2"), drain this water into the Tacks' pond. (Deposition of Charles Cadie, pages 22-23).

When there is a large amount of rainfall, the Tacks' pond and the City's sludge pond merge.  (Deposition of Bill Miller, pages 21, 25).  The floodwater does not always get into the equalization basin and sludge pond.  (Deposition of Bill Miller, page 66).

Mr. Miller does not believe the Tacks have waste on their Property.  (Deposition of Bill Miller, page 25).  The only water that comes across the Tacks' Property is what backs up from Bayou Meto during a flood.  (Deposition of Bill Miller, page 25).  By gravity, the water flows up to the Tack Property from Bayou Meto when the water is rising, and when the water is receding it flows down from the Tack Property to Bayou Meto. (Deposition of Bill Miller, pages 26, 68-69).

The Tacks' pond has two drain outlets, marked "12" on Map 2.  (Deposition of Joan Tack, page 54, Deposition of Charles Cadie, page 13).  When the pond rises to the point that the drain outlets start flowing water, the water flows through the drain pipes out onto the Tacks' Property.  (Deposition of Joan Tack, page 54).  When the City's pond and the Tacks' pond merge, the levee disappears under the water.  (Deposition of Joan Tack, page 68).  The ponds only merge after a really heavy rain.  (Deposition of Joan Tack, page 69).

There is a low place in the levee where water has flowed from the Tacks' pond into the sludge pond.  (Deposition of Bill Miller, pages 67-68).  Mr. Miller saw the Tacks' pond overflow the low place in the levee into the sludge pond.  (Deposition of Bill Miller,

pages 31, 68).  The Tack pond overflowed into the sludge pond at least once in 2009, but it may have happened twice because there were two major rain events, one in May and one in October and November of 2009.  (Deposition of Bill Miller, page 69).  Mrs. Tack does not know which pond fills up first.  (Deposition of Joan Tack, page 53).  The Property has flooded several other times prior to 2009.  (Deposition of Bill Miller, page 69).

Barry Tack personally witnessed the flooding during the last major rain of 2009, in October and November.  (Deposition of Barry Tack, page 31).  Before the two sewer plants were built, there was one occasion when the water flooded the road in front of the Tacks' Property.  (Deposition of Joan Tack, pages 50-51).  Since the sewer treatment plants were built, the City property and the Tack Property have flooded maybe three or four times in the last four or five years.  (Deposition of Joan Tack, page 53).  When the Tacks moved there the flooding problem already existed.  (Deposition of Bill Miller, page 26).  The buildings do not have anything to do with flooding.  (Deposition of Bill Miller, page 26).  The same time the water flooded in front of the Tacks' Property, the two manhole covers popped off and released raw sewage.  (Deposition of Joan Tack, pages 51-52).  Mayor Hillman has been to the Property after a heavy rain to see the flooding. (Deposition of Virginia Hillman, page 16).

The SBR plants are built above the flood level.  (Deposition of Bill Miller, page 65).  Floodwater has gotten around the plant, but it has never overflowed a basin. (Deposition of Bill Miller, page 65).  The SBR basins are approximately sixteen feet tall. (Deposition of Bill Miller, page 66).  The basins have never been compromised by

floodwater.  (Deposition of Bill Miller, page 66).  The plants are fully operational, even during high water.  (Deposition of Bill Miller, page 66).

## The Pipe

There is a pipe under the road in front of the sewer treatment facility that drains the floodwater in the low-lying area [marked number 5 on Map 1] into the Tacks' pond. (Deposition of Joan Tack, page 54).  The pipe under the road is not the exclusive means of releasing water from the pond.  (Deposition of Bill Miller, page 68).  The pipe is approximately a 15-inch pipe.  (Deposition of Bill Miller, page 67).  The water that goes through the pipe is Bayou Meto overflow water that comes from the wooded area. (Deposition of Bill Miller, page 67).

The Tacks did not put the pipe there and did not know it was present under the road.   (Deposition of Joan Tack, page 54, Deposition of Barry Tack, pages 32-33). Charlie Cadie does not know who installed the pipe, but he believes it has been there since he began working for the City approximately ten years ago.  (Deposition of Charles Cadie, page 15).  Mr. Miller does not know who put the pipe there, but it has been there since the road was established.  (Deposition of Bill Miller, page 21).  Mr. Miller believes the pipe was put in when Michael Clayton was in charge of wastewater management. (Deposition of Bill Miller, page 22).

Mrs. Tack first learned about the pipe during depositions of the City of Sherwood officials.  (Deposition of Joan Tack, page 67).  Mrs. Tack believes the City must have installed the pipe. (Deposition of Joan Tack, page 65).  Mrs. Tack does not know if the pipe affects whether the low-lying area [marked number 5 on Map 1] floods the road and the front of her Property.  (Deposition of Joan Tack, pages 65-66).

Mr. Tack did not supervise the work that was done to dig the dirt out of the Tacks' pond but did ride his four-wheeler at times while the plant was being built; the people who built the plant supervised the removal of the dirt from the Tacks' pond. (Deposition of Joan Tack, page 67). Mr. Tack only gave them permission to get the dirt off the Tacks' land. (Deposition of Joan Tack, page 67). There is another pipe, marked number "11", which runs across the front of the Property. (Deposition of Charles Cadie, page 12). Mr. Cadie believes Mr. Tack installed this pipe. (Deposition of Charles Cadie, page 12). This second pipe drains water from the front of the Tacks' house into the low-lying, wooded area north of the road, which the City owns. (Deposition of Charles Cadie, pages 12-13).

## Odors

The sludge pond, equalization lagoon, and treatment facility were there as part of the lagoon system treatment facility when the Tacks moved to their Property. (Deposition of Bill Miller, page 24). The facility's buildings were built after the Tacks lived on the Property. (Deposition of Bill Miller, page 24). The two ponds the City used prior to building the sewer treatment facility were not visible from the Tacks' house and never produced an odor. (Deposition of Joan Tack, page 57).

There was no odor from the plant in the beginning, but as time went by it began to smell. (Deposition of Joan Tack, pages 57, 60). Mrs. Tack believes the odor first became noticeable around 2003. (Deposition of Joan Tack, page 61). Mrs. Tack does not know if the second plant immediately produced an odor. (Deposition of Joan Tack, page 61). Mrs. Tack only noticed every now and then there would be an odor coming from the plant that was pretty bad. (Deposition of Joan Tack, page 61).

Mrs. Tack does not know if the odor is noticeable everyday now because she travels so much and does not live there. (Deposition of Joan Tack, page 61). When Mrs. Tack lived on the Property, the odor was not apparent every day, but she estimates the odor was present about half the time. (Deposition of Joan Tack, page 61). The odor was strong enough that it bothered her. (Deposition of Joan Tack, page 61). The smell is worse on some days than others, but she cannot tell what causes the smell to be worse on any particular day. (Deposition of Joan Tack, page 57).

The Tacks' neighbors also complain about the odor from the treatment facility. (Deposition of Joan Tack, pages 56-57). Mrs. Tack's grandson and his family were going to stay in her house during Thanksgiving, but the smell was so bad Mrs. Tack told them they should get a hotel. (Deposition of Joan Tack, page 57).

<u>Utility Lines</u>

Mrs. Tack believes the City put several telephone wires and a water line under her Property. (Deposition of Joan Tack, page 73). One day, the Tacks came home and there was a man down the road, on their Property, digging a hole with some type of equipment that looked like a lawn mower. (Deposition of Joan Tack, page 73). Mr. Tack drove his four-wheeler out to the man and asked what he was doing. (Deposition of Joan Tack, page 73). The man told Mr. Tack to get out of the way because he was told to dig the hole. (Deposition of Joan Tack, page 73). Mr. Tack told him he was on his property, but the man did not stop. (Deposition of Joan Tack, pages 73-74). Eventually, Mr. Tack got on his tractor and parked it in front of the man. (Deposition of Joan Tack, page 74).

Mr. Tack then left the house and told Mrs. Tack later that he had been to see Mayor Harmon, but the mayor was not in. (Deposition of Joan Tack, page 74). Mr.

26

Tack spoke to Mayor Harmon on the phone, and the mayor said he would take care of it. (Deposition of Joan Tack, page 74). The man had been trying to lay a utility line of some kind. (Deposition of Joan Tack, page 74). Mrs. Tack believes the incident with the tractor took place around four or four and a half years ago. (Deposition of Joan Tack, pages 78-79).

Three or four weeks after the incident with the tractor, Charlie Cadie, the plant manager, told Mrs. Tack that he put the line down on her Property. (Deposition of Joan Tack, page 75). Mrs. Tack did not tell Mr. Tack about this because she did not want to upset him. (Deposition of Joan Tack, page 75).

When Barry Tack discussed getting an appraisal on the Property with Mayor Harmon, he said they needed to put some lines down. (Deposition of Barry Tack, page 28). Barry told Mayor Harmon he would talk to Mrs. Tack about it, but he did not think she would want to do that. (Deposition of Barry Tack, pages 28-29). After that, the Property was dug up and something was put on the Property, and Barry believes the City placed the lines without discussing it further with his mother. (Deposition of Barry Tack, page 29). Barry knows something has been put on the Property because he maintains the Property. (Deposition of Barry Tack, page 29). Mrs. Tack believes there are telephone and water lines, and possibly other lines, on her Property. (Deposition of Joan Tack, pages 75-76).

There is a water line under the road, and there is a force main on the City's side of the road. (Deposition of Bill Miller, pages 38-39). There is also a gravity sewer. (Deposition of Bill Miller, page 39). The line Mr. Miller drove down to the plant is in the center of the road. (Deposition of Bill Miller, page 39). All of those lines were placed

27

while Mr. Tack was alive, and he was aware of where the utilities were being placed. (Deposition of Bill Miller, page 39).

The City installed a water line south of the road, on the Property, pursuant to a verbal agreement with Mr. Tack.  (Deposition of Charles Cadie, page 19).  The City does not have an easement for the water line, to Mr. Cadie's knowledge.  (Deposition of Charles Cadie, page 19).  At the time the line was placed, the facility did not have water, and the City asked the Tacks if the lines could be placed on the side of the road, because the City had other utilities on the other side.  (Deposition of Charles Cadie, page 19). The water line was laid with a Ditch Witch, and the Tacks allowed the City to place the line on the Property as long as the City put the dirt, grass, road, and anything else that was disturbed back as it was.  (Deposition of Charles Cadie, page 19).

To Mr. Cadie's knowledge, there is no other utility line south of the road. (Deposition of Charles Cadie, page 20).  There is a sewer main, marked number "13" on Map 2, which runs diagonally across the Property.  (Deposition of Charles Cadie, page 20).  The sewer main runs through the front portion of the Property, and it has been that way for years.  (Deposition of Charles Cadie, page 20).  A second sewer main runs across the back of the Property.  (Deposition of Charles Cadie, page 20).  Mr. Cadie believes the City has an easement for the main sewer lines.  (Deposition of Charles Cadie, pages 20-21).

If a line was placed somewhere under the Tacks' driveway, it was not done at Mr. Miller's direction.  (Deposition of Bill Miller, pages 39-40).  Mr. Miller does not know anything about a utility line placement under the Tacks' driveway.  (Deposition of Bill Miller, page 40).  Mr. Miller does not know if there are any utility lines on the Tacks' side

28

of the road.  (Deposition of Bill Miller, page 40).  Mayor Hillman does not know about any utility lines possibly being placed on the Tacks' side of the road.  (Deposition of Virginia Hillman, pages 17-18).

Mrs. Tack thinks the water line was put in years ago, around the time the first plant was built.  (Deposition of Joan Tack, page 78).  Mrs. Tack believes the utility lines were put in over the years.  (Deposition of Joan Tack, page 78).  The Tacks knew the telephone wires were there because they saw the phone company put the lines in; Mrs. Tack says they complained, and they said they would take them up, but one of the guys at the plant said the lines are still there.  (Deposition of Joan Tack, page 78).  Mrs. Tack does not know which company put the telephone wires in.  (Deposition of Joan Tack, page 78).

There was another incident with Charlie Cadie, the plant manager, and he told Mrs. Tack he needed to lay a utility line on her Property because his side of the road was too full.  (Deposition of Joan Tack, page 80).  Mrs. Tack said no, and Charlie started shouting at her about all the things he had done for her, but Mrs. Tack does not know what he meant by that.  (Deposition of Joan Tack, page 80).  Mrs. Tack told Mr. Cadie the City would own the Property soon, and to just wait.  (Deposition of Joan Tack, page 80).

A few days prior to her deposition, Mrs. Tack noticed that her driveway had been cut in two places, by a machine, so she assumes that Mr. Cadie put in the line he told her about.  (Deposition of Joan Tack, page 82).  Barry believes something else was put on the Property recently.  (Deposition of Barry Tack, page 29).  Holes and trenches have been dug on the Property, and Mrs. Tack has not given anyone permission to lay lines on the

29

Property.  (Deposition of Barry Tack, page 29).  After the lines are laid, the land is sodded with hay and seed, which has caused ruts.  (Deposition of Barry Tack, page 29).  The most recent time the land was disturbed and then sodded occurred in summer 2009. (Deposition of Barry Tack, page 29).

Mr. Tack did not want to give any easements on his land.  (Deposition of Barry Tack, page 30).  Mr. Tack told the City if they needed to lay utility lines to put them on the five acres the Tacks had already sold to the City or on the City's side of the road, instead of on the Tacks' Property.  (Deposition of Barry Tack, page 30).

## ADEQ Violations

The wastewater management crew has to turn in a permit to the ADEQ monthly. (Deposition of Bill Miller, page 28).  Over the years the permits have gotten more and more restricted.  (Deposition of Bill Miller, page 28).  The department files two reports monthly with the ADEQ.  (Deposition of Bill Miller, page 54).

Prior to the consent order, the ADEQ conducted an inspection of the facility. (Deposition of Kevin Lilly, page 26).  The ADEQ report concerned things like cleaning around the facility and mechanical issues within the wastewater treatment that were not being taken care of.  (Deposition of Virginia Hillman, page 13).  Mechanical would have been in charge of addressing the problems, and Michael Clayton was in charge of the wastewater department at that time.  (Deposition of Virginia Hillman, pages 11-12). Michael Clayton is no longer employed by the City.  (Deposition of Virginia Hillman, page 12).  Mr. Clayton resigned his position with the City in order to go into business for himself, and his departure was not related to the ADEQ violations.  (Deposition of Virginia Hillman, page 12).

30

The City of Sherwood Sewer Department is subject to an ADEQ administrative consent order, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "9". The ADEQ violations were discussed at the called meeting of the City Council on December 30, 2008. (Deposition of Kevin Lilly, page 14). One of the problems the ADEQ addressed concerned the ponds at the north plant overflowing. (Deposition of Kevin Lilly, page 15). Mr. Lilly believes the ponds overflowed into Bayou Meto. (Deposition of Kevin Lilly, page 15). Mr. Lilly believes there was mention of the ponds overflowing onto the Tacks' Property. (Deposition of Kevin Lilly, page 15).

At the December 30, 2008 meeting, the City Council voted to hire Crist Engineers. (Deposition of Kevin Lilly, page 16). Crist Engineers is working with Ellen Norvell, the City Engineer, to develop a plan for long-term sewer treatment and rehabilitation and short-term fixes that would bring the sewer plant into compliance with the ADEQ administrative consent order. (Deposition of Kevin Lilly, page 16, Deposition of Bill Miller, page 53). The master plan has been completed, and it was submitted to and approved by the ADEQ. (Deposition of Bill Miller, page 54).

The ADEQ inspection reports noted that the levees around the ponds at the sewer treatment plants were in bad shape because of vegetation growth and the lack of free board, or distance between the top of the liquid in the pond and the top of the levee. (Deposition of Kevin Lilly, pages 18-19). The ADEQ wants the City to reconstruct the levees, including the levee between the Tacks' pond and the sludge pond, and the City has agreed. (Deposition of Bill Miller, pages 27, 31). The department has plans to improve all of the levees, including the one bordering the Tacks' Property, pursuant to the master plan approved by the ADEQ. (Deposition of Bill Miller, page 48). Beaver and nutria in

31

the levees are two of the problems. (Deposition of Bill Miller, page 47). The department has to repair these problems quite often, and the department has hired a man to trap the beaver. (Deposition of Bill Miller, page 47).

Another problem the ADEQ found was that the plant was out on fecal content discharge. (Deposition of Bill Miller, page 27). The new plant is subject to tighter restrictions than the basins. (Deposition of Bill Miller, page 28). When the wastewater management department first opened the plant, it took a while to get it up and running, and it was "out on fecal," or discharging above the limit it was allowed to discharge. (Deposition of Bill Miller, pages 28-29). A discharge above the limit will result in an ADEQ violation even if it only happens once; the facility does not have to be continuously over the limit. (Deposition of Bill Miller, page 52). The discharge is not discharged into the sludge pond; instead it is discharged into a ditch that goes around and into Bayou Meto Creek. (Deposition of Bill Miller, page 29). With regard to the December 30, 2008, called City Council meeting minutes, when Cindy Garner mentioned effluent violations, she was probably referring to the department discharging over the fecal content limit. (Deposition of Bill Miller, pages 51-52).

A wastewater committee meeting was held April 7, 2009. (Deposition of Kevin Lilly, page 17, Deposition of Bill Miller, page 45). There were two different overflow scenarios. (Deposition of Kevin Lilly, page 18). One dealt with the treatment plants themselves, and the other dealt with the collection system. (Deposition of Kevin Lilly, page 18). Mr. Lilly believes this meeting's minutes refer to the collection system, not the treatment plant. (Deposition of Kevin Lilly, page 18). Mr. Miller believes the overflow response plan referenced in the April 7, 2009, wastewater committee meeting minutes is a

plan the department has in force in case there is an overflow the facilities cannot handle, such as the overflow that would follow a line collapse.  (Deposition of Bill Miller, page 46).  The overflow has nothing to do with the ponds, only the line itself.  (Deposition of Bill Miller, page 46).  If the facility ever has an overflow, it overflows on the back side of the City's property.  (Deposition of Bill Miller, pages 47-48).  The overflow response plan referenced in the minutes is part of the ADEQ master plan.  (Deposition of Bill Miller, pages 54-55).

The notice of the ADEQ's consent order was published in the newspaper. (Deposition of Barry Tack, page 15, Deposition of Virginia Hillman, page 13).  The Tacks feel the consent order, combined with the smells and problems from the plant, caused their Property to be devalued.  (Deposition of Barry Tack, page 15).  Prior to publication of notice of the consent order, Barry Tack did not know that the City was in violation with the ADEQ.  (Deposition of Barry Tack, page 15).  Barry Tack felt that publication of the ADEQ violations in the newspaper required the Tacks to disclose that information to potential buyers.  (Deposition of Barry Tack, page 15).  After notice of the ADEQ consent order was published in the paper, the Tacks felt there was no point in having the Property on the market.  (Deposition of Barry Tack, page 30).

Barry Tack has not read the consent order between the City and the ADEQ and does not know what it contains.  (Deposition of Barry Tack, pages 16-17, 30-31).  Barry Tack has only read what was published in the newspaper and the ADEQ meeting notes. (Deposition of Barry Tack, page 16).  Barry Tack believes the sewer treatment plant was in violation for quite some time, and the City has been trying to negotiate to pay the penalties instead of fixing the problem.  (Deposition of Barry Tack, page 31).  Barry Tack

33

does not know what the City is doing to fix the problems.  (Deposition of Barry Tack, page 31).

## The Money

The Sherwood sewer committee has ten million dollars in a bank account. (Deposition of Bill Miller, page 73).  The sewer committee cannot spend that money without City Council approval and appropriation.  (Deposition of Bill Miller, page 74). The money can only be used for certain things, such as executing the master plan. (Deposition of Bill Miller, page 74).  Mr. Miller is not sure if the money could be used to purchase property.  (Deposition of Bill Miller, page 74).  The money belongs to the sewer department and was raised from a one-cent sales tax in order to improve the facilities and purchase North Little Rock systems within the Sherwood city limits.  (Deposition of Bill Miller, page 75).

## ARGUMENT

### 1.    Governmental Entity Estoppel

A claim based upon "detrimental reliance" seeks to estop a party from taking some action.  *Miller v. City of Lake City*, 302 Ark. 267, 270 (1990), citing *Foote's Dixie Dandy, Inc. v. McHenry*, 270 Ark. 816 (1980).  The Tacks contend that City officials' promises that the City would buy the Property should estop the City from declining to purchase the Property, because the Tacks relied on that promise to their detriment. However, "[e]stoppel will protect the citizen only to the extent that he relied upon actions or statements by an agent."  *Foote's Dixie Dandy*, 270 Ark. at 824.  The Tacks cannot prove reliance on any alleged statements made by City officials, and governmental entity estoppel therefore does not apply.

In *Arkansas Department of Human Services v. Estate of Ruby Lewis*, 325 Ark. 20, 922 S.W.2d 712 (1996), the Arkansas Supreme Court summarized the cases following *Foote's Dixie Dandy*, stating that the doctrine of estoppel has only been applied against the state "where an affirmative misrepresentation by an agent or agency of the State has transpired." *Id.* at 714.   Estoppel should not be applied where there is no clear proof of an affirmative misrepresentation by the state. *Everett v. Jones,* 277 Ark. 162, 639 S.W.2d 739 (1982). *See Duchac v. City of Hot Springs,* 67 Ark. App. 98, 106, 992 S.W.2d 174, 179 (1999) (principle of necessity of affirmative misrepresentation applied to a city). "Equitable estoppel requires that an innocent person be misled to his or her detriment, so that it would be inequitable to permit the person estopped to change an original position." *Owners Association of Foxcroft Woods, Inc. v. Foxglen Associates*, 346 Ark. 354, 367, 57 S.W.3d 187, 196 (2001).    "Estoppel is unavailable when there is no showing of reliance upon a misleading action." *Hope Education Association v. Hope School District*, 310 Ark. 768, 771, 839 S.W.2d 526, 527 (1992).

In the present case, the Tacks allege that the City, through its employees or officials, made false or misleading statements related to the City's proposed purchase of the Property, upon which the Tacks relied.  The Tacks first engaged in a land transaction with the City around 1994, when they deeded one acre to the City in exchange for another piece of land. (Deposition of Joan Tack, page 37).  Around 2002, the Tacks sold a four acre parcel to the City; this parcel was adjacent to the original one acre purchased by the City.  (Deposition of Joan Tack, pages 39, 42).  The Tacks entered into both of these transactions with the hope that selling the City a small part of the Property would prevent the City from taking the entire Property by eminent domain.  (Deposition of

35

Barry Tack, page 14).   Bill Harmon was the Mayor of Sherwood during both of these transactions, and Mrs. Tack says that over the years, on several different occasions, Mayor Harmon told both Mr. Tack and Mrs. Tack that the City would be interested in purchasing the Property if they ever decided to sell.  (Deposition of Joan Tack, page 30).

In May 2006, Mr. Tack passed away.  (Deposition of Joan Tack, pages 8-9).   In September, Mrs. Tack asked her son, Barry Tack, to talk to Mayor Harmon about selling the Property to the City.  (Deposition of Joan Tack, page 9).  Barry Tack met with Mayor Harmon and had the Property appraised at the Mayor's request, but no action was taken by the City after receiving the appraisal.  (Deposition of Joan Tack, pages 9, 14, Deposition of Barry Tack, pages 5-6).   The appraisal valued the Property at $499,000.  (Deposition of Sheila Sulcer, page 19, Sherwood City Council Meeting minutes, November 24, 2008, page 5).   Mrs. Tack then listed the Property on the real estate market, with her son Barry as her real estate agent.  (Deposition of Joan Tack, page 14, Deposition of Barry Tack, pages 5-6).

Mayor Harmon has passed away.  (Deposition of Joan Tack, page 62).   Virginia Hillman became Mayor of Sherwood in 2006.  (Deposition of Virginia Hillman, page 7). After approximately two years on the market, Mrs. Tack received one offer on the Property, in the summer of 2008.  (Deposition of Barry Tack, page 7, Deposition of Joan Tack, pages 15, 19).   Bill Miller called Barry Tack around the same time the offer was made and told him Mayor Hillman was interested in purchasing the Property. (Deposition of Joan Tack, page 14).

The offer on the Property was made by Anthony Neff, in the amount of $169,000.  (Deposition of Barry Tack, page 7, Deposition of Joan Tack, pages 15, 19).  Mrs. Tack

received the offer on August 2, 2008. (Deposition of Barry Tack, pages 5, 10, Deposition of Joan Tack, page 15). Mrs. Tack did not believe $169,000 was enough for the Property, and she hoped she could sell the Property to the City for a higher price. (Deposition of Joan Tack, pages 19, 30-31).

Mrs. Tack called Mayor Hillman on the afternoon of August 2, 2008. (Deposition of Joan Tack, page 15). Mrs. Tack told Mayor Hillman about Mr. Neff's offer and Bill Miller's call to Barry Tack expressing interest in the Property. (Deposition of Joan Tack, page 15).

Mayor Hillman said she was definitely interested in the Property and the City needed it to ensure the sewer plant was in compliance with certain rules and regulations. (Deposition of Joan Tack, page 15). Mrs. Tack asked Mayor Hillman if she was certain the City wanted to purchase the Property, and Mayor Hillman said yes. (Deposition of Joan Tack, pages 15-16). Mayor Hillman said she did not want anyone to miss a sale, but she would find out if the City was still interested. (Deposition of Virginia Hillman, page 20). Mrs. Tack called Mayor Hillman a second time that afternoon at the urging of Barry Tack, who wanted his mother to make sure Mayor Hillman understood that Mrs. Tack was going to reject Mr. Neff's offer and that the City was really interested in the Property. (Deposition of Joan Tack, page 16, Deposition of Barry Tack, page 9). Barry Tack also spoke with Mayor Hillman, and she said she understood the Tacks were going to reject Mr. Neff's offer without counter-offering. (Deposition of Barry Tack, page 9). After these telephone calls, Joan Tack rejected Anthony Neff's offer. (Deposition of Joan Tack, pages 16, 20-21, Deposition of Barry Tack, page 9).

During the telephone conversations, no one mentioned or discussed a price for the Property. (Deposition of Barry Tack, page 11). Mayor Hillman and Mrs. Tack agreed to meet to discuss the Property the following week. (Deposition of Virginia Hillman, page 21). On August 5, 2008, Joan and Barry Tack met with Mayor Hillman, City Attorney Steve Cobb, City Engineer Ellen Norvell, and Alderman Charles Harmon. (Deposition of Joan Tack, page 27, Deposition of Barry Tack, page 11, Deposition of Virginia Hillman, page 21). During the meeting, the City officials and the Tacks discussed the proper procedure for the City if it decided to move forward with the purchase. (Deposition of Virginia Hillman, pages 23-24). They decided that the Tacks should make an offer to sell the Property to the City. (Deposition of Virginia Hillman, pages 24-25). The City Attorney explained to the Tacks that the City Council would have to authorize the purchase. (Deposition of Virginia Hillman, page 24). After a series of negotiations between City Attorney Steve Cobb and Barry Tack, the Tacks presented an offer to sell the Property to the City for $229,000, contingent upon City Council approval. (Deposition of Joan Tack, pages 17-18, Deposition of Barry Tack, pages 21-22). On November 24, 2008, the City Council declined to purchase the Property under the terms of the offer. (Deposition of Barry Tack, page 22, Deposition of Bill Miller, page 38).

The Tacks now contend that the August 2, 2008 discussions between Mayor Hillman and Mrs. Tack led the Tacks to believe that Mayor Hillman could make a legally binding promise on behalf of the City, and they relied on this belief when they rejected Mr. Neff's offer. (Deposition of Barry Tack, page 10). The Tacks stated, however, that Mayor Hillman said she was "interested" in the Property and the City "wanted" to purchase the Property. (Deposition of Joan Tack, pages 15-16, Deposition of Barry Tack,

38

pages 9, 25).  The Tacks did not testify that Mayor Hillman said the City "would" or "will" buy the Property, and a purchase price was not discussed.  (Deposition of Barry Tack, page 11).  Mayor Hillman testified that she told Mrs. Tack she "didn't want anyone to miss a sale."  (Deposition of Virginia Hillman, page 20).  The Tacks were told at the August 5, 2008 meeting that City Council approval was necessary, and both Mrs. Tack and Barry Tack testified that they understood the City could only purchase the Property if the City Council approved the terms of the offer.  (Deposition of Joan Tack, page 18, Deposition of Barry Tack, page 22).  Mrs. Tack also admitted that no one gave her any assurance that the City Council would accept the offer.  (Deposition of Joan Tack, page 18).  Moreover, Mrs. Tack presumably knew or should have known that City Council approval was needed because of her two prior transactions with the City.

Regardless of Mrs. Tack's knowledge of the need for City Council approval, however, Mrs. Tack testified that she thought the City would offer her a higher price than Mr. Neff and that she was dissatisfied with the amount Mr. Neff offered.  (Deposition of Joan Tack, pages 19, 30-31).  Mr. Neff offered $169,000 (Deposition of Joan Tack, page 19); during Barry Tack's negotiations with Steve Cobb, Barry said he would like the City to offer between $300,000 and $350,000, even though $350,000 was more than double Mr. Neff's offer.  (Deposition of Barry Tack, page 14).  Moreover, the Property was listed at that time for $249,000.  (Deposition of Joan Tack, page 27).  Mrs. Tack's rejection of Mr. Neff's offer evidences only her desire to obtain more money for the Property, not explicit reliance on the City's purchase of the Property.  Additionally, neither Mrs. Tack nor Barry Tack took steps to attempt to reopen negotiations with Mr. Neff once they

learned City Council approval was necessary, nor did they take the Property off the market.

While the Court should consider all evidence with respect to the potential purchase of the Property by the City, the Contract between the City and the Plaintiffs is irrelevant to prove reliance by the Plaintiffs because the contingency clause clearly stated, and the Plaintiffs understood, that City Council approval was necessary before the City could purchase the Property.

Based on her two previous land sales to the City, Mrs. Tack should have known that City Council approval was required for the purchase of the Property and could not have relied in good faith upon any alleged representation by a City official that any one person could create a binding contract on the City's behalf or that City Council approval was not needed.  Moreover, there is no "clear proof of an affirmative misrepresentation by the state" as required by *Everett* because the Tacks have not testified that Mayor Hillman, Bill Miller, or any other City official said anything more than that they "wanted" to purchase the Property.   Mrs. Tack could not have relied upon these statements, and therefore there is no basis for estoppel.

2.    **Inverse Condemnation and Federal Takings Claims**

The Plaintiffs assert both state and federal takings claims.  (*See* Complaint, ¶ 3). The Tacks' allegations do not rise to the level necessary to prove a taking on either the state or federal level.   Under Arkansas law, a taking is defined as "a serious interruption of the common and necessary use of the property as to interfere with the rights of the owner." *City of Fayetteville v. Stanbury*, 305 Ark. 210, 214, 807 S.W.2d 26, 27 (1991). A takings claim under federal law is derived under the Fifth and Fourteenth Amendments

to the United States Constitution and exists when private property is taken by the government for a public purpose, which requires just compensation to be paid to the owner. *See Creason v. City of Washington*, 435 F.3d 820 (8th Cir. 2006), *Milligan v. City of Red Oak, Iowa*, 230 F.3d 355 (8th Cir. 2000)

### a.    State Takings Claim

A taking "condemn[s] and destroy[s] all reasonable value of the property" and requires that the property owner be "compensated in full for their loss." *Robinson v. City of Ashdown*, 301 Ark. 226, 230, 783 S.W.2d 53, 55 (1990). A more thorough definition is

> [D]amage that will substantially oust the owner and deprive him of all beneficial enjoyment thereof; will substantially abridge the owner's rights to such an extent as to deprive him of his right; will be an interference with or disturbance of property rights resulting in injuries which are not merely consequential or incidental; a taking is determined by the character of the invasion and not by the amount of damage resulting from it, as long as the damage is substantial.

*Thompson v. City of Siloam Springs*, 333 Ark. 351, 969 S.W.2d 639 (1998), quoting *City of Fayetteville v. Stanberry*, 305 Ark. 210, 214, 807 S.W.2d 26 (1991). Permanent damage is not necessary. *Stanberry*, 305 Ark. at 214, 807 S.W.2d at 28. However, there must be "some measure of substantiality for an injury to constitute a taking." *Id.*

State law inverse condemnation, as originally conceived, is a cause of action "against a governmental defendant to recover the value of property which has been taken in fact by a governmental entity although not through eminent domain procedures." *National By-Products v. City of Little Rock*, 323 Ark. 619, 624, 916 S.W.2d 745, 747-48 (1996). In *Stanberry*, the plaintiffs filed an inverse condemnation action based on their complaint that a 24-inch sewer line installed by the city caused raw sewage to overflow

on their property periodically, beginning in 1969 and continuing until the trial in 1990. *Stanberry*, 305 Ark. at 212, 807 S.W.2d at 26. In *Robinson v. City of Ashdown*, the plaintiffs alleged inverse condemnation after their house was repeatedly flooded with raw sewage for a period of nine years because of defects in the sewer system's lift station. 301 Ark. 226, 227, 783 S.W.2d 53, 54 (1990).

Both the Stanberrys and the Robinsons contacted their respective cities frequently to complain, and both were assured the problem would be corrected. *See Stanberry*, 305 Ark. at 212, 807 S.W.2d at 26-27; *Robinson*, 301 Ark. at 227, 783 S.W.2d at 54. The Robinsons also asked city water department officials to inspect the home, and they appeared before the City Council to complain about the damage to their home. *Robinson*, 301 Ark. at 228, 783 S.W.2d at 54. Unlike the Stanberrys and Robinsons, the Tacks did not voice any of their assorted complaints to the City. (Deposition of Joan Tack, pages 41 and 60). Neither Mrs. Tack nor Barry Tack attended the City Council meeting to advocate approval of the City's purchase of their home. (Deposition of Joan Tack, page 18, Deposition of Barry Tack, page 22). Mrs. Tack admits that she did not notify the City of her complaints about the sewer treatment facility before the City Council declined to purchase the Property (Deposition of Joan Tack, pages 41, 60), and she did so after the City Council meeting only by filing the present lawsuit. The only other complaint referenced in Mrs. Tack's deposition concerned Mayor Harmon's promise to replace the trees and shrubbery between the Tacks' Property and the sewer plant; Mrs. Tack admits that when asked, Mayor Harmon complied with her request, and trees were planted, although they still were not to Mrs. Tack's liking because of their small size. (Deposition of Joan Tack, pages 64-65). The City officials were not on notice

as to how unhappy the Tacks were with their Property because the Tacks took no action to notify them; City officials were unaware of any unresolved complaints prior to the Tacks' failed attempt to sell the Property to the City.

Additionally, the Tacks' complaints do not involve the repeated exposure to raw sewage as the Stanberrys and Robinsons were subjected to. In *Robinson*, the family was subjected to raw effluent that infiltrated their house through the showers and toilets, which in turn developed fungus and caused several members of the family to develop fungal infections. *Robinson*, 301 Ark. at 229, 783 S.W.2d at 54. Mrs. Tack alleges raw sewage leaked out onto the street only once, when the manhole covers came off during a flood. (Deposition of Joan Tack, pages 51-52). Mrs. Tack's testimony reflects that this occurred only once (Deposition of Joan Tack 51-52), and the City remedied that problem. Unlike the situation in *Robinson*, where the house suffered extensive water damage, *see* 301 Ark. at 228, 783 S.W.2d at 54, the flooding has never reached the Tacks' house, (Deposition of Joan Tack, page 68), and Mrs. Tack does not allege that her home has been damaged by raw sewage or even treated effluent in the floodwater.

With regard to the merger of the Tacks' pond and the sludge pond, Mrs. Tack conceded that she does not know that her pond contains raw sewage, she said only that the ponds "mix[ed]," and she assumes her pond is now contaminated. (Deposition of Joan Tack, page 53). Bill Miller's undisputed testimony shows that the Tacks' pond has not been contaminated with raw sewage; raw sewage is treated in the SBR plants (Deposition of Bill Miller, page 59), which have never been compromised by flood waters. (Deposition of Bill Miller, page 66). Moreover, Mr. Miller testified that the sludge pond's contents have been through the purification process and are not biohazards. (Deposition

of Bill Miller, pages 61-62).   The Supreme Court affirmed judgment against the city in *Robinson* because of the city's negligence in maintaining the sewer lines that caused the sewage to back up into the Robinsons' home.  *Robinson*, 301 Ark. at 232-33, 783 S.W.2d at 56.  The Tacks, on the other hand, do not allege negligence and admit that heavy rains cause the merger of the ponds, not any act or omission of the City.  (Deposition of Joan Tack, page 53).

Finally, for a taking to exist, there must be a public benefit.   *Robinson*, 301 Ark. at 232, 783 S.W.2d at 56.  In *Robinson*, the public benefit was the city's failure to remedy the problem and resulting "use of the Robinsons' home as an overflow dump for sewage." *Id.*  The Tacks have not and cannot show a public benefit.  The City's facility is subject to the flooding of Bayou Meto as much as any other property in the area, and the flooding is not caused by the City.   Moreover, the flooding does not benefit the City in any way, as the Tacks' pond is not being used as an overflow pond for the sewer plant's use.  The City has taken (and is continuing to take) steps to prevent treated effluent in its ponds from mingling with floodwaters, but the proximity of the plant to the Tacks' Property does not automatically imply a taking of any kind.

Mrs. Tack has not shown that the City continuously or repeatedly caused raw sewage to invade the Property and essentially complains that she does not like living next to a sewer treatment facility.  The Defendant therefore requests that the Court decide this case on the merits of a federal takings claim rather than deferring judgment to a state court for decision on inverse condemnation, the state equivalent to a constitutional takings claim.

b.    **Federal Takings Claim**

Essentially the elements of a federal takings claim are the same as those for a state claim: the taking of private property for public use, without just compensation.  As stated above, there has been no taking because the City has not interfered with the Property to the extent that the Tacks have been prevented from residing on the Property, and the City is not using the Property to benefit the public.

If the City's conduct does not rise to the level of a taking under state law, it also fails to rise to the level of a federal taking.  Because the state and federal claims are identical, the Defendant requests the Court decide the case on its merits.  If inverse condemnation does not exist, there cannot possibly be a takings claim or a federal due process claim.  If the Court elects instead to remand this action to state court so that the Tacks may exhaust their available state court remedy of inverse condemnation, *see Metzger v. Village of Cedar Creek, Nebraska*, 370 F.3d 822, 823 (2004), the Defendant respectfully requests the Court hold the federal action in abeyance, in order to preserve any surviving federal causes of action that would be subject to the time constraints of removal.

3.    Nuisance

The facts the Tacks base their takings claims upon show that their complaints are actually allegations of nuisance, which do not give rise to a constitutional violation.  A nuisance is "conduct by one landowner that unreasonably interferes with the use and enjoyment of the lands of another and includes conduct on property that disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property." *Aviation Cadet Museum v. Hammer*, 373 Ark. 202, 208, 283 S.W.3d 198, 204 (2008), citing *Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579 (1999).  However,

> [t]he general rule is that, in order to constitute a nuisance, the intrusion must result in physical harm, which must be proven to be certain, substantial, and beyond speculation and conjecture[, and a] mere fear or apprehension of danger, without more, is not sufficient to warrant injunctive relief for the abatement of a nuisance.

*Id.*, citing *Ark. Landfill, Inc. v. State*, 313 Ark. 669, 858 S.W.2d 665 (1993) and *Milligan v. Gen. Oil Co.*, 293 Ark. 401, 738 S.W.2d 404 (1987).

### a.    The Sewer Treatment Facility's Presence as an Alleged Nuisance

The Tacks have not set forth certain and substantial physical harm to the Property, only Mrs. Tack's unsubstantiated assertion that the Tack pond must be contaminated after the City's pond and the Tack pond "mix" when heavy rains cause one or both of the ponds to rise higher than the levy. (Deposition of Joan Tack, page 53).   Therefore, the Tacks' claim that the sewer treatment facility is a nuisance fails.

Additionally, any claim that the sewer treatment facility is a nuisance is offset by the fact that the facility was present when the Tacks purchased the Property.  (Deposition of Joan Tack, pages 32-33).   Therefore, the "coming to the nuisance" theory of estoppel is a factor in this case.   Section 42 of the American Law Reports, Third Edition, provides as follows:

> Generally, the fact alone that a person moved into the vicinity of a nuisance by purchasing or leasing property in the area does not bar him from complaining, in an action for damages, injunction, or any other appropriate remedy, against the continued operation or maintenance of the nuisance. But while "coming to a nuisance" is not an absolute defense or estoppel, this factor, among others, is relevant in determining whether the defendant's use of his property is unreasonable, and if so, whether the complainant is entitled to relief.
> In determining whether one who "came to the nuisance" may obtain relief therefrom, it is proper to consider the nature of the area where the alleged nuisance and the complainant's property are located, although the fact that defendant established the alleged nuisance when the site was still relatively uninhabited, but that the site subsequently became populated, is generally

46

> insufficient to deny the complaint any relief.   But the fact that the
> complainant knew fully well, when he acquired his property, that there was
> a nuisance nearby has been emphasized by some courts in denying relief.

"Coming to Nuisance as a Defense or Estoppel," 42 A.L.R.3d 344.

The original sewage ponds were present when the Tacks purchased the Property. (Deposition of Joan Tack, pages 32, 33, Deposition of Bill Miller, page 57).  In addition to the facility's presence prior to the Tacks' purchase of the Property, the Tacks sold at least one parcel of their land to the City for the City's stated purpose of expanding the lagoon system into a package plant system.  (Deposition of Joan Tack, pages 32, 35, and 59).  The sewage treatment facility's inevitable expansion was (or should have been) clearly foreseeable at the time the Tacks purchased the Property.  The Tacks did foresee the City's possible need for more land after the first sale, as evidenced by Barry Tack's statement that his father chose to sell the land piece by piece in order to avoid losing all of it. (Deposition of Barry Tack, page 14).  Possible disadvantages as a result of the facility's expansion and increased number of customers – for example, increased odors – should have been equally foreseeable.

In addition to selling the City the land upon which to expand the facility, the Tacks observed the construction of the package plant and should have realized it would be visible from their home, but did not attempt to halt the construction, nor did they protest before, during, or after the plant was built.  (Deposition of Joan Tack, page 41). After the initial sale of one acre and Mrs. Tack's (unvoiced) unhappiness with the first plant, the Tacks sold the City more land.  (Deposition of Joan Tack, pages 38-39). Despite any alleged promises of City officials as to how the second parcel would be used,

the Tacks were not forced to sell any of their land to the City and could have elected not to do so if they felt the treatment facility's presence was a nuisance.

Mrs. Tack continually says she did not want to sell the land, but the fact remains that she and her husband did exactly that.  She contends that their decision to sell was based on fear that the City would take it from them if they did not comply, but she says nothing of any actions they took to dissuade the City from purchasing the property upon which the plants were built, nor does she mention any actual threat to take the Property if the Tacks refused to sell the land.  Ironically, she has now filed a lawsuit to compel the City to take the Property.  If the Tacks really did not want to sell the first two parcels of land to the City, they could have risked the Property being taken by eminent domain. Instead it seems that the Tacks chose to do nothing and accede to the City's requests without protest.

The Tacks' knowledge of the sewer treatment facility's presence when they purchased the Property, combined with their voluntary actions that facilitated construction of the facility's expansion, show that they are not innocent parties upon whom this alleged nuisance has been thrust.  The Tacks knowingly moved next to the sewer treatment facility, and Mrs. Tack cannot now complain that the facility is a nuisance and demand payment.

### b.   The Odor as an Alleged Nuisance

Mrs. Tack also complains of an odor emanating from the sewer plant.  (Deposition of Joan Tack, pages 14, 57, and 61).  The more appropriate action for the Tacks' odor complaint is a nuisance claim, not a federal takings claim.  The odors emanating from the sewer treatment facility may qualify as "conduct by one landowner that unreasonably

interferes with the use and enjoyment of the lands of another and includes conduct on property that disturbs the peaceful, quiet, and undisturbed use and enjoyment of nearby property" as defined by *Hammer*, but this claim also fails to establish that the City has effectively "taken" the Property.

*Robinson* also involved complaints of odor, which was described as "ever-present" in the house and "constantly smelly and damp."   301 Ark. at 228-29, 783 S.W.2d at 54. Mrs. Tack contends that the odor is noticeable "about half the time."  (Deposition of Joan Tack, page 61).   This description is not analogous to the "ever-present" characterization of *Robinson*.  Moreover, Mrs. Tack is unfamiliar with the pervasiveness of the odor because she elected not to spend much time in the home after the death of her husband – not because the odor was so overpowering that it made her house uninhabitable.  (Deposition of Joan Tack, page 5).

Additionally, a claim for trespass may lie for an intangible invasion of property such as an odor, and in such a case American Jurisprudence provides as follows:

> To recover in trespass for an intangible invasion to property, a plaintiff must show: (1) an invasion affecting an interest in exclusive possession; (2) the act resulting in the invasion was intentional; (3) reasonable foreseeability that the act could result in an invasion of the plaintiff's possessory interest; and (4) substantial damage to the property. Thus, intangible intrusions on land, such as electric and magnetic fields emitted from power lines, are not actionable as trespasses, unless they cause physical damage to the real property.

75 Am.Jur.2d § 27, Physical and Tangible Intrusion.  The Tacks do not allege that the odor has caused any physical damage to the Property, and therefore the elements of a trespass claim are not met.  If the alleged odors are deemed a nuisance, such activity still does not rise to the level of a constitutional violation.

49

4.      Alleged Trespass

The Tacks assert various alleged trespasses of the City, including flooding, the alleged placement of utility lines on the Property, the use of the Tacks' driveway by City employees, and the alleged unauthorized placement of a pipe beneath the shared road. The Tacks also complain about the visibility of the plant from their house, but this is not a trespass, and the degree of visibility was never made a condition of sale in the dealings between the City and the Tacks.  (Deposition of Joan Tack, pages 63-64).

A trespass is established by proof of the defendant's intentional and unlawful interference with a plaintiff's right to the possession of certain real property and resultant damages.   75 Am. Jur. 2d, Trespass § 180.   The aforementioned trespasses are not evidence of a taking, and the appropriate remedy for trespass is damages, not forcing the City        to        purchase        the        Property        in        its        entirety.

a.      Flooding

The flooding of the Tacks' Property is not a trespass caused by the City, and the City therefore should not be held responsible for any alleged trespass of floodwaters.  The Tacks' allegations regarding floodwaters seem to be that after heavy rains, both properties are more susceptible to flooding, the flooding comes onto the Tacks' property from the City's property, and the City should therefore take action to prevent such flooding.

Different standards exist for defined watercourses and surface water. *Boyd v. Greene County,* 7 Ark. App. 110, 112, 644 S.W.2d 615, 616-17 (1983), citing *Little Rock & Fort Smith Railway Co. v. Chapman*, 39 Ark. 463, 474 (1882).  A watercourse has been defined as

50

> [A] running stream of water; a natural stream, including rivers, creeks, runs
> and rivulets. There must be a stream, usually flowing in a particular
> direction, though it need not flow continuously. It may sometimes be dry. *It
> must flow in a definite channel, having a bed and banks,* and usually
> discharges itself into some other stream or body of water. *It must be
> something more than mere surface drainage over the entire face of the tract
> of land occasioned by unusual freshets or other extraordinary causes.*
> [Emphasis theirs].

*Boyd*, 7 Ark. App. At 112, 644 S.W.2d at 617, citing *Boone v. Wilson,* 125 Ark. 364, 188

S.W. 1160 (1916).  By the Tacks' own allegations that the water results from flooding

caused by heavy rains, the water in question must be characterized as "mere surface

drainage."

"Where no watercourse exists . . . a landowner is justified in defending against

surface runoff without incurring liability for damages unless injury is unnecessarily

inflicted upon another which, by reasonable effort and expense, could be avoided." *Bilo*

*v. El Dorado Broad. Co.*, 101 Ark. App. 267, 271, 275 S.W.3d 660, 663 (Ark. Ct. App.

2008), quoting *Boyd v. Greene County,* 7 Ark.App. 110, 112, 644 S.W.2d 615, 616-17

(1983).  In assessing damages, another case noted that the property in question was not

"substantially or unnecessarily damaged or injured by any accelerated flow of surface

waters." *Dent v. Alexander*, 218 Ark. 277, 280, 235 S.W.2d 953, 955 (1951).

By this rule, both the Tacks and the City may take action to repel surface water

from their respective properties, as long as neither "substantially or unnecessarily"

damages the other.  The Tacks do not allege any substantial or unnecessary damage

resulting from the flooding.  There are several pipes that drain floodwater from the Tacks'

Property and from the City's property.  (Deposition of Charles Cadie, pages 10, 12-13).

As shown on Map 2, drainage pipes are present at the numbers "4", "11", and "12".  At all times relevant to this case, all of these drainage pipes were present.

Barry Tack admits that Bayou Meto and heavy rains are causes of the flooding. (Deposition of Barry Tack, page 32).  The City is not responsible for preventing Bayou Meto from flooding, nor do the Tacks contend that the City causes the flooding.  The Tacks admit that their land flooded prior to the construction of the SBR plants, noting that "the low-lying acre has always filled in with water when it rains."  (Deposition of Joan Tack, pages 50-51).  The Tacks' land is especially susceptible to flooding because it is located in a low-lying area.  (Deposition of Joan Tack, page 55).

Interestingly, the Tacks are using City property to abate flooding in their front yard by means of a pipe on the Tacks' Property that drains surface water onto the one acre now owned by the City.  Mrs. Tack admitted that the land in front of her house floods, but the waters have never reached her house (Deposition of Joan Tack, pages 65, 68), a circumstance possibly resulting from the presence of this pipe.  The Tacks cannot divert water from the front of their Property onto the low-lying portion of the City's land and then complain that the City is wrongly draining water from that low-lying acre through the pipe into their pond.  The land around the Tacks' home and pond is flood-prone, and by installing their own pipe, it seems the Tacks favored draining the front of their Property over the back; perhaps if they had not drained the water from the front, the volume of water flowing into their pond would decrease, and the pond would not mix with the City's during a heavy rain.  For these reasons, the Tacks cannot show that the City's actions constitute a trespass.

**b.**   **Utility Lines**

The Tacks contend that City officials have planted utility lines on the Tacks' side of their adjacent properties. This complaint does not rise to the level of a constitutional violation, nor does it amount to a taking of the Property. Neither Mr. Miller nor Mayor Hillman have knowledge of utilities laid without the permission of the Tacks (Deposition of Bill Miller, page 40, Deposition of Virginia Hillman, pages 17-18), but Mr. Miller contends that all lines laid under his supervision were brought to the attention of Mr. Tack. (Deposition of Bill Miller, page 39). Mr. Cadie testified that a water line was laid during construction of the plant with Mr. Tack's permission. (Deposition of Charles Cadie, page 19). There is no evidence that a survey has been conducted to determine what lines lay where. At best, this complaint may amount to a trespass, for which the Tacks are not entitled to damages in the amount of the entire value of the Property.

c.    Use of the Driveway

Both Mrs. Tack and Bill Miller stated that the Tacks gave the City permission to use their driveway on several different occasions. (Deposition of Joan Tack, page 48, Deposition of Bill Miller, page 41). Again, this complaint at most amounts only to a trespass, and the Tacks' remedy is damages, not just compensation for taking the entire Property. Mrs. Tack complains that the City stopped asking permission, (Deposition of Joan Tack, page 48), and Mr. Miller contends that Mrs. Tack has never asked him to refrain from using her driveway at times when the shared road is inaccessible due to flooding. (Deposition of Bill Miller, page 42). These statements are not necessarily contradictory; instead they are likely the result of a miscommunication. Mrs. Tack was under the impression that Mr. Miller and other City officials would continue to ask her

permission to use the driveway, even though she is rarely home, and Mr. Miller believed he had permanent permission, which he may have actually had from Mr. Tack prior to his death.

Mrs. Tack's complaint thus amounts only to a desire to change or terminate their agreement. However, Mrs. Tack's failure to ask Mr. Miller to cease using the driveway now prohibits her from contending he did so in violation of her wishes. The Tacks did not erect a fence or other obstacle to prevent the City's entrance. (Deposition of Barry Tack, page 34). Additionally, while using the driveway is more convenient for the facility's employees when the road is flooded, it is not the only means of accessing the facility, as the plant may be accessed by boat when the road is flooded. (Deposition of Bill Miller, page 42). Moreover, Mrs. Tack cannot truthfully contend that Mr. Miller failed to ask permission on each occasion because she no longer resides in the house. (Deposition of Joan Tack, page 5). The Tacks expect the impossible in that they want the City to knock on the door before using the driveway, but no one is home to give them permission. For these reasons, this claim also fails.

> d.    The Pipe

The Tacks complain that the City must have placed the pipe beneath the road, because they did not put it there and did not know it was present until recently. (Deposition of Joan Tack, page 54). The circumstances here are similar to those in *Hedger Brothers Cement & Materials, Inc. v. Stump*, in which case the parties owned adjacent properties in a low-lying area. 69 Ark. App. 219, 224, 10 S.W.3d 926, 929 (2000). The Stump court refused to enjoin the operation of a drain installed on one property that diverted floodwater to the other property because the complaining property

owner failed to show that the operation of the drain resulted in damages. *Id.* The court noted that both properties were "prone to have standing water, due to the nearby presence of [a watercourse], which floods quite often." *Id.*

The pipe under the road shared by the Tacks and the City serves to drain water that, if not for the pipe, would flood the road and possibly other areas of the Tacks' Property, as well as the City's property. The pipe is a benefit to both property owners, as it prevents further flooding, and the Tacks' suggestion that they are somehow damaged by its presence is without merit. The presence of a second pipe in the front of the Tacks' Property, which drains water from in front of the house onto the low-lying one acre now owned by the City, also damages the credibility of this claim. The Tacks cannot reconcile the alleged damage caused by the first pipe with the fact that they also have a pipe to drain waters from their Property onto the City's property, and it is unreasonable for them to drain the water off their own land but expect the City to refrain from doing the same.

## 4.    Alleged Devaluation of Property

The Tacks contend that their Property has been "devalued" by the presence of the City's sewer plant. (Deposition of Barry Tack, page 17). However, the Tacks have failed to present proof of actual monetary damage to the Property. In *National By-Products v. City of Little Rock*, an animal by-product rendering plant sued the city for inverse condemnation and claimed that plans to expand the airport's runway through its property amounted to a taking. 323 Ark. 619, 621, 916 S.W.2d 745, 746 (1996). The airport commission had the property appraised and acquired the surrounding residential properties but did not have enough funds to purchase the rendering plant. *Id.* at 621-622, 916 S.W.2d at 746. After newspaper articles detailing the proposed runway expansion

were published, both potential customers and potential purchasers of the business lost interest. *Id.* at 622-23, 916 S.W.2d at 747. The plant complained that its land value had been "depressed," but the trial court found that "inverse condemnation has historically involved some type of invasion or trespass where governmental activities interfere <u>substantially</u> with the quiet enjoyment of the subject property or diminish its commercial use" and dismissed the complaint. *Id.* at 624, 916 S.W.2d at 747 (emphasis added).

In upholding the trial court's dismissal, the Arkansas Supreme Court noted the concept of "condemnation blight," or "the debilitating effect upon value of a threatened, imminent or potential condemnation." *Id.* at 624-25, 916 S.W.2d at 748, *citing* 4 J. Sackman, Nichols on Eminent Domain, §12B.17[6] (Rev. 3d ed 1995). The Court also noted that it has been held that "damages for loss of business and depreciation of property resulting from the condemnation of adjacent land are non-compensable where there is no interference with possession, use, or enjoyment of such land." *Id.* at 625, 916 S.W.2d at 748, *citing* 4 J. Sackman, Nichols on Eminent Domain at 12B-256-258. Moreover, the Court cites *Danforth v. United States*, in which the United States Supreme Court held that "[a] reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. <u>Such changes in value are incidents of ownership</u>. They cannot be considered as a 'taking' in the constitutional sense." *National By-Products*, 323 Ark. at 625, 916 S.W.2d at 748, *citing Danforth*, 308 U.S. 271, 60 S. Ct. 231 (1939) (emphasis added).

The *National By-Products* Court also noted that the Arkansas Supreme Court dismissed a similar case in *Hood v. Chadick, County Judge*, 272 Ark. 444, 615 S.W.2d 357 (1981), in which a county commission discussed taking a landowner's property for

56

parking.  *National By-Products*, 323 Ark. at 626, 916 S.W.2d at 748.  The landowner brought a condemnation suit to enjoin the county from taking the property and for loss of rentals.  *Id.*  The Arkansas Supreme Court affirmed the trial court's dismissal and noted that the county "never took possession or even entered upon Hood's property and concluded that '[n]o damages are allowable for a mere 'threat to condemn.'"  *Id.* at 626, 916 S.W.2d at 748-49.  The Court also noted that the law in this jurisdiction and others is that "mere plotting or planning in anticipation of an improvement does not constitute a taking or damaging of property affected where the government has not imposed a restraint on the use of the property."  *Id.* at 626, 916 S.W.2d at 749.

The Tacks' circumstances are more analogous to condemnation blight than to an unconstitutional taking.  They say the Property has been "devalued" (Deposition of Barry Tack, page 17) but present little to no evidence as to how much value their Property has lost and simultaneously contend that the $499,000 appraisal remains current.  (*See* Complaint, ¶ 10).  Mrs. Tack further admitted that she dropped the price of the house while it was listed on the real estate market because she was "anxious to sell," not because of any evidence the City had caused the Property's value to decrease.  (Deposition of Joan Tack, page 31).  Moreover, Mrs. Tack thought it would be "smarter" to sell the Property to the City than to an individual buyer (Deposition of Joan Tack, page 30), and assumed from the discussions of years past that the City would buy the Property when she decided to move, despite having no promise to that effect in writing.  The circumstances are identical to those present in *Hood*: the City never took possession or even threatened to condemn her Property and never put restraints on the use of her Property, but Mrs.

Tack anticipated their need for the Property and from that has concluded that it has effectively been taken.

With regard to the effect of the ADEQ violations upon the value of the Property, the publication of the violations in the newspaper did not contain a statement that the Tacks' property had been damaged, nor did it state that the City would expand the North Plant by purchasing the Tacks' Property.   Moreover, the newspaper articles do not specifically mention the Property, but they do specifically mention problems with the sewage system at "1005 Silver Creek" (*see* Exhibit "10", Arkansas Democrat Gazette, "Sherwood pays $15,500 to state over sewage spill") and "Shoshoni Drive" (*see* Exhibit "11", Sherwood Voice, "Sherwood wastewater system holds up under downpours", October 16, 2009).

Further, the consent order clearly applies to the Sherwood sewer system in its entirety, not only to the North Plant specifically.  (*See* Exhibit "9").  The Sherwood sewer system contains other plants in addition to the North Plant, and the lines run underground throughout the City.  The allegation that somehow the Tacks' Property has been devalued by the consent order any more than any other property serviced by the sewer system or adjacent to one of its treatment plants or lift stations is absurd.  Their alleged damage, if any, is no different than any other landowner who may be subject to the flooding of the sewer mains because of groundwater infiltration, which scenario would arguably be worse than any experience of the Tacks', because the sewer mains contain raw sewage and the ponds at the facility contain treated wastewater.

The presumption that a regulatory sanction per se constitutes a taking of any property adjacent to the sanctioned property is a novel idea, but there is no law to

support that theory.  This argument also fails because every community has sewer systems under the regulatory jurisdiction of the ADEQ or some other governmental agency, and the very purpose of regulation is to ensure compliance with the law.  Additionally, the City has no obligation to provide a sewer system, but does so as a public service to its residents.  In this instance, the consent order was put in place in order to bring the Sherwood sewer system into compliance, which implies that once the objectives of the consent order are completed, the owners of property adjacent to its facilities, lift stations, and lines will be better served by the system than before; rather than devaluing or damaging property, the consent order is likely <u>benefiting</u> all property owners within its service area, including the Tacks, because it makes the City improve the system.

The Property's presence next to the sewer plant does not devalue it today any more than it did when the Tacks purchased the Property.  It should also be noted that if there is any source advertising the City's alleged devaluation of the Property, it originates from the Tacks themselves in their disclosure of the ADEQ violations to potential buyers, despite having no knowledge of the contents of the consent order or whether the ADEQ violations have any significant impact whatsoever on the Property.

The Tacks have shown no evidence of actual damage to the Property, nor have they shown that the City's actions in its operation of the sewer plant are the proximate cause of the difference in price between the appraised value and the amount an individual buyer would be willing to pay for the Property.  On the contrary, the Tacks have benefitted financially from the facility's presence next door; from the sale of five acres of land and the dirt in their pond, the Tacks were paid $41,000 and gained an acre of land formerly owned by the City.  Even if the Tacks' Property has been devalued (and the

Defendant does not believe it has), the Tacks' damages should not be the entire value of their Property.

CONCLUSION

For the foregoing reasons, the Defendant is entitled to judgment as a matter of law, and the Defendant requests that the Plaintiff's Complaint be dismissed in its entirety.

**Fuqua Campbell, P.A.**
Attorneys at Law
425 West Capitol Ave., Suite 400
Little Rock, Arkansas 72201
(501) 374-0200
Attorneys for the City of Sherwood


By: David M. Fuqua
Ark. Bar No. 80048

**CERTIFICATE OF SERVICE**

I, David M. Fuqua, hereby certify that the foregoing pleading has been served via the Court's CM/ECF system on:

Stephen B. Niswanger
steve@niswangerlawfirm.com

Alexander Cale Block
Cale@Niswangerlawfirm.com

on this 9th day of April, 2010.


David M. Fuqua